J. G. LANDRETH AND WIFE, CARRIE LANDRETH, v. FRED MORRIS, ADMINISTRATOR OF THE ESTATE OF GEORGE W. LANDRETH.

(Filed 4 January, 1939.)

1. **Evidence § 46: Executors and Administrators § 15d—**

In an action to recover upon *quantum meruit* for personal services rendered deceased, it is competent for witnesses to testify from their knowledge of living conditions and observations of services of the character alleged to have been rendered deceased, as to the value of such services in the community.

2. **Executors and Administrators § 15d—**

The presumption that personal services rendered by a child to his parent are gratuitous arises from the relationship in a typical unbroken family, or one which has been reunited in the same relationships, and the presumption is necessarily affected by evidence that the respective moral and legal obligations of its members are different from that which gives rise to the rule.

3. **Same—Evidence held insufficient to support presumption that services rendered by child to parent were gratuitous as matter of law.**

The evidence, considered in the light most favorable to plaintiffs, tended to show that the male plaintiff had attained his majority, married, and moved away from the home place, that his father, the intestate, had sold practically all his personal effects and gone to live with a daughter and son-in-law; that thereafter plaintiffs moved back to the home place, bringing their furniture, stock, and farm implements; that some two weeks thereafter intestate moved back to the home place and lived with them the balance of his life; that the male plaintiff paid rent to intestate for the land in much the same manner as he would to a stranger; that during the latter part of his life intestate was in very poor health, and that plaintiffs gave him the constant and onerous care and attention required by his condition. *Held:* The evidence does not justify the application of the presumption that the services were rendered gratuitously as a matter of law, and the question was properly submitted to the jury.

**4. Same—**

> The presumption that services rendered by a child to his parent are gratuitous does not apply to the relationship between a father-in-law and daughter-in-law.

APPEAL by defendant from *Hill, Special Judge,* at May Term, 1938, of FORSYTH. No error.

The plaintiffs sued the defendant, administrator of the estate of George W. Landreth, to recover for services alleged to have been rendered the deceased Landreth by them during the last years of his life. The plaintiffs are the son and daughter-in-law of the intestate, Landreth.

The evidence is to the effect that the plaintiffs were married in 1926, and had been living away from the Landreth home place. That place had been vacant for some time. Meanwhile, the father was living with a son-in-law, Frank· Taylor, at another place. Taylor had been away from the George Landreth place for about three years before plaintiffs moved there.

The plaintiff Landreth moved to his father's old place with his wife and children in 1926; and in about two weeks thereafter the father moved in with them and lived there for about ten years, dying in the spring of 1937.

There were seven brothers and sisters besides plaintiff. None of them lived in the house with plaintiff and his father during the last five years of the latter's life, all living at a distance from eight to ten miles away, visiting him at infrequent intervals.

The plaintiff and his wife took care of the father, George Landreth, who, during the latter part of his life, was in very poor health, much of the time bedridden. During the latter part of his life he was unable to control his bodily functions and had to be cared for in much the same manner as an infant.

Mrs. Landreth testified that after their marriage she and her husband lived at her father's place a while, and later at the Hester place. Mr. George W. Landreth was not living at his home place when her husband and herself moved there in December, 1926, but did move there about two weeks afterwards; that she and her husband did farm work, raising tobacco, wheat, corn, vegetables of all kinds; cultivated sixty-three acres. In 1932, Mr. Landreth was taken sick and was under the care of a doctor. From 1936 until February, 1937, the intestate was practically helpless; during a large part of that time and prior thereto intestate was bedridden and required much attention.

Other witnesses testified to the bad health of the intestate and the necessity for special attention, and to the fact that he was unable to

perform any work; and to his physical condition, which required constant attention to keep intestate, his bed, and surroundings in a sanitary condition; and to the attention given by plaintiffs.

T. A. Martin testified that during the year 1934 he measured the tobacco crop about the first of August, 1934, and that the intestate told him about the "terms that him and Gurthie (plaintiff) had in regard to the tobacco crop. He said he got one-third of the tobacco." He saw the deceased in 1934, 1935, and 1936, when he measured the tobacco crop; that he heard this plaintiff say in the presence of the intestate that he (plaintiff) furnished the stock to cultivate the tobacco; that the customary allowance to a landowner in the cultivation of a crop in that community where he furnished only the land was one-third, and that the intestate, G. W. Landreth, told witness that he got one-third of the tobacco crop. Mr. George Landreth told witness that they "all ate the bread and the only part he taken was out of the tobacco."

There was further evidence that the Landreth place was vacant for a while until Gurthie Landreth, the plaintiff, moved there.

P. G. Landreth, a brother of intestate, testified that during the last three years of his brother's life his condition was very bad; that he was unable to do anything, and was in bed practically all the time. During this time witness visited his brother, found his room kept "nice and clean and sanitary"; that his brother said the kind of attention he was getting was good, extra good. The witness stated that decedent said to him: " 'I am not going to be here very much longer,' and he says, 'I am lots of trouble to Carrie and Gurthie, but,' he says, 'I can't help it.' He says, 'I haven't got any will, I don't believe in making a will, but,' he says, 'when I am dead and gone I hope the children will all get together and do what's right for them, you understand, come to some agreement without going to the courts.' He said, 'I hope it won't go to the courts.' He said, 'I want them well paid, but,' he said, 'if it does go to the courthouse I am not worrying about that. I know 12 men will give them justice.' "

"During this conversation, Carrie came in there while we were talking, but I don't know whether she paid any attention to it or not."

There was other testimony as to the condition of the intestate, the service rendered him by the plaintiffs, and the value thereof.

The defendant offered testimony as to the financial condition of the intestate, amongst other things his deposits at the bank. There is evidence to the effect that interests on these deposits were paid to Gurthie Landreth, the plaintiff. Other witnesses for the defendant testified as to the condition of the intestate and the fact that his health was varied, at times bad and at times better, and that there were times "when he could get about and times probably he could not."

One witness testified to having heard Gurthie speak about having quit paying rent, the last time in the spring after his father died. Witness did not know whether or not he did pay rent for the last year to the administrator, but that plaintiff did say that he paid rent up to the time he spoke to him about it, had been paying rent out of the tobacco all the time, but not out of the grain.

There was further evidence to the effect that the intestate had sold all of his personal belongings except some trunks and a "half bed," bed covering, and a few other personal articles, upon moving away from the old place, and that these were moved into the old Landreth home place already occupied by plaintiffs about two weeks after they got there.

Overruling the defendant's motion for nonsuit, the trial judge submitted the evidence to the jury on appropriate issues, which were answered in favor of the plaintiffs; and from judgment upon the verdict of the jury, the defendant appealed.

*Elledge & Wells for plaintiffs, appellees.*
*Ingle, Rucker & Ingle for defendant, appellant.*

SEAWELL, J. Noting the exceptions to the evidence brought forward in the brief, we are of the opinion that the testimony of witnesses, with only the common experience derived from a familiarity with living conditions and observation of the services of the character alleged to have been performed for the intestate, was competent as to the value of those services in the community in which they lived. The defendant's exception to admission of this evidence is without merit.

The defendant relies upon the evidence tending to show the existence of family unity and the relation of the plaintiffs to the intestate as rebutting the presumption of an implied promise to pay for the services rendered by plaintiffs, and replacing it with the presumption that the services were gratuitously rendered. *Winkler v. Killian,* 141 N. C., 575, 579, 54 S. E., 540.

In the cited case it is said, quoting *Ruffin, J.,* in *Williams v. Barnes,* 14 N. C., 348: "It cannot be possible that the head of a harmonious household must drive each member off as he shall arrive at age, or be bound to pay him wages or for occasional services, unless he shows that it was agreed that he should not pay."

The opinion quotes further, with approval, from *Dodson v. McAdams,* 96 N. C., 149, 154: ". . . This rule is founded in large measure upon the supposition that the father clothes, feeds, educates, and supports the child, and that the latter labors and does appropriate service for the father and his family in return for such fatherly care and domestic comfort and advantage. The family relation and the nature of

the service rebut the ordinary presumption that arises when labor is done for a party at his request, express or implied, of a promise on his part to pay for it." Further analyzing *Winkler v. Killian, supra,* we find the following: "In *Young v. Herman,* 97 N. C., 280, it is held: '(1) When a child after arrival at full age continues to reside with and serve the parent, the presumption is that the service is gratuitous. (2) But this presumption may be rebutted by proof of facts and circumstances which show that such was not the intention of the parties, and raise a promise by the parent to pay as much as the labor of the child is reasonably worth.' Again, in *Callahan v. Wood,* 118 N. C., 752, quoted in this case, we find: 'We do not put our decision entirely on the kinship relation, *but also on the one-family relation established and maintained by the parties.'* "

The presumption arising out of the family unity and the relation of the members of the family to each other must necessarily yield to evidence indicating that the *modus vivendi* of the family is different from that which gives rise to the rule. The presumption is affected by the family vicissitudes and those changes in the composition and relationships of the group which are apt to come when it contains adult members who have their own separate responsibilities, both moral and legal. The "unity" of which the presumption speaks means more than living in the same house and eating off the same table. It signifies that reciprocity of service which might be expected of a typical unbroken family, or one which has been reunited in the same relationships.

In the case at bar the evidence, taken in its most favorable light for the plaintiffs, shows that young Landreth, one of the plaintiffs, had attained the age of twenty-one years, married, and moved away, entirely breaking his connection with the family, and assuming other paramount duties and obligations to his own separately established family. The intestate had sold all of his personal effects except a "half bed," some trunks, and a gun, and had gone to live with a son-in-law. Seven children lived at various distances, from eight to ten miles, and these visited him infrequently. Not a vestige of family organization remained. The plaintiff Gurthie Landreth and his wife moved to the old place, carrying their furniture, stock, and farm implements, under a rental agreement which intestate might have made with a stranger; and the evidence, although conflicting, will support the finding that the rents were paid up to the time of intestate's death. The facts of this case are not consistent with the philosophy which is said in *Winkler v. Killian, supra,* to underlie the presumption of gratuitous service.

As to the *feme* plaintiff, the daughter-in-law, we note the rule that in this State the fact of "family unity," of itself, is not sufficient to give rise to the presumption of gratuitous service; there must also be a cer-

tain relationship between the parties from which it may be supposed the services were referable to some moral or legal duty which the servitor recognizes as impelling. When the law goes outside the law for a rule of civil conduct based on those moral considerations which society imposes on its members as both commendable and compelling, it must be content with what it finds. It cannot be said that usage in this State recognizes the moral responsibility of a daughter-in-law, or a son-in-law, to such an extent as to raise a presumption of gratuitous service arising out of that relation. The presumption is adopted in *Callahan v. Wood, supra,* repudiated in *Dunn v. Currie,* 141 N. C., 123, 53 S. E., 533; ignored in *Henderson v. McLain,* 146 N. C., 329, 59 S. E., 873; and denied in *Nesbitt v. Donoho,* 198 N. C., 147, 150 S. E., 875. In that state of the law we see no reason to apply to the *feme* plaintiff, by whom the major part of the service was rendered, a rule which smacks more of the story of Ruth and Naomi than it does of the common law.

The presumption of gratuitous service is too precariously seated on the evidence in this case to justify its application as a matter of law. The circumstances under which the family relations were resumed, if at all, and what these relations were, and what significance might be attached to them, were matters for the jury.

We see no reason to disturb the verdict. Upon the record we find No error.