VELLER JEFFRIES, ADMINISTRATRIX OF McKINLEY JEFFRIES, DECEASED, v. L. R. POWELL, JR., AND HENRY W. ANDERSON, RECEIVERS OF SEABOARD AIR LINE RAILWAY COMPANY,
and
RAYMOND BRANCH v. L. R. POWELL, JR., AND HENRY W. ANDERSON, RECEIVERS OF SEABOARD AIR LINE RAILWAY COMPANY.

(Filed 5 June, 1942.)

**1. Trial § 22b—**

Upon motion to nonsuit, defendant's evidence will not be considered except to explain or clarify plaintiff's evidence when it is not in conflict therewith. C. S., 567.

**2. Railroads § 9—**

Evidence disclosing that the driver of a car in approaching a crossing could have seen defendant's train in ample time to have stopped, but drove upon the crossing to his injury without seeing the approaching train *is held* to show contributory negligence on the part of the driver barring recovery by him as a matter of law.

**3. Railroads § 6—**

A speed of sixty miles per hour on the part of a train traveling through a rural section, nothing else appearing, is not unlawful or negligent.

**4. Railroads § 9: Automobiles § 21—Evidence held to show that negligence of driver was sole proximate cause of crossing accident, and precluded recovery by administratrix of guest.**

Evidence disclosing that the driver of a car approached a railroad crossing in a rural section with which he was familiar at five to ten miles an hour, that his view of the approaching train was unobstructed for thirty or forty feet before reaching the live track. and that he drove upon the crossing without seeing the train, which struck the car, injuring the driver and killing a guest in the car, *is held* to disclose negligence on the part of the driver operating subsequent to any negligence on the part of the railroad company in failing to give warning by bell or whistle of the approach of its train, and therefore such negligence on the part of the driver insulated any negligence on the part of the railroad company in failing to give warning and constituted the sole proximate cause of the accident, precluding recovery against the railroad company by the administratrix of the guest.

**5. Evidence § 5—**

It is a matter of common knowledge that an automobile driven at a speed of five to ten miles an hour can be stopped almost instantly.

SEAWELL, J., dissents as to the nonsuit against the administratrix.

APPEAL by plaintiffs from *Thompson, J.,* at October Term, 1941, of WAKE.

Two civil actions to recover damages, in the first for wrongful death, C. S., 160-161, and in the second for personal injury, allegedly resulting from actionable negligence of defendants—consolidated by the court below for the purpose of trial.

The evidence tends to show these facts:

The plaintiff Raymond Branch sustained personal injury, and McKinley Jeffries, intestate of plaintiff Veller Jeffries, Administratrix, was killed on Sunday morning, 7 May, 1939, about 9 o'clock, when Branch's automobile in which they were riding was struck by a fast southbound passenger train of defendants at a crossing of a dirt road—"not a public road"—and the railroad track of defendants about one-quarter mile south of Millbrook Station, south of Wake Forest, and north of Raleigh, in the county of Wake. Branch was sitting on the left side of and operating the automobile, and Jeffries as the guest of Branch, was sitting on the right side. The railroad runs north and south. The automobile approached from the east.

The crossing is described by some of the witnesses for plaintiffs as being in a curve of the railroad, though no one of them was willing to venture an estimate of the extent of the curve. On the other hand, a civil engineer, witness for defendants, testified that there is actually a 45-minute curve, that is, the curve deflects about 8 inches to the right in every 100 feet and in a long segment "it picks up to where you can see a slight curve." Also, a witness for plaintiffs testified that standing on the track one could see as far as Millbrook station.

The dirt road leads from two houses, the homes of the father and uncle of plaintiff Branch, situated on the east side of the railroad—the former being "something like 300 feet therefrom"—to and across the railroad, and thence through the property and yard of O. A. Norwood to U. S. Highway #1, "not a quarter mile out there" west of the railroad. As described by plaintiff Branch, "It is not a public road, just a road for the outlet of the people . . . just a small road . . . the best path out."

The crossing was first put there about 30 years ago, but was taken out two or three years before Norwood bought the place, after which, according to testimony of father of plaintiff Branch, Norwood had a second one put in by the railroad section force, and had permitted the use of it for the last five or six years.

On each side of the main line track at the crossing there is a side or passing track—the main line being some higher than the sidetracks. Evidence for plaintiffs tends to show that the sidetrack on the east is 6 or 8 feet from the main line, but, according to the civil engineer, witness for defendants, there are actually 13 feet between the east sidetrack and the center line of the main track.

The dirt road as it leads from the Branch home to the crossing is described as being an S-curve beside the railroad. It starts at the bottom of the letter, runs east nearly to the railroad, then turns south in the general direction of the railroad, crosses a bridge, then veers to the left, and on up-hill curve to the right to the crossing, and straightens out about 30 or 40 feet from the track at the crossing. After passing the bridge and veering to the left there are an oak tree and some bushes standing on the right side of the road 42 feet from the main track of the railroad, according to evidence for plaintiffs, and by actual measurement 66 feet east of a point 65 feet north of the crossing, according to the civil engineer, witness for defendants. All the evidence tends to show that after passing this oak and the bushes in approaching the crossing from the east there was no other obstruction on the right or, as expressed by Deputy Sheriff Maynard, witness for plaintiffs, "no more bushes, no more anything except air toward Wake Forest."

Plaintiff Branch testified: "When I could first see by this tree and bushes we were something like 30 or 40 feet from the main line track." Yet he says, "When I got by the bushes toward Wake Forest I could see about 50 feet, I imagine, down the track." Also, there is testimony of three other witnesses, who made observations at the scene, who give various estimates of distances north of the crossing that the track was observable after passing the tree and bushes. But all hands agree that there is no obstruction on the right of the road between the tree and bushes and the railroad. Too, all agree that as one approaches the track view may be had farther down the track. The witness Deputy Sheriff Atkins testified: "When you pass the bushes you could see approximately 80 or 85 feet down the rails . . . when you got 20 feet of the track, I didn't measure it, but you could see a good distance from there, about 150 feet . . . when you are 10 feet from the track I don't think there is anything to keep you from seeing all the way down, because the right of way is open on both sides."

Furthermore, in the opinion of the father of plaintiff Branch: "You have to come near getting on the sidetrack before you can get a good view of the railroad. When you get on the sidetrack you have a pretty good view as far as the planer." That distance, according to the civil engineer, witness for defendants, is about 1,200 feet.

On the other hand, the civil engineer, witness for defendants, testified, that standing in the road at a point 50 feet from the crossing the full

14—221

view could be had of a man standing on the track north of the crossing at a distance of 850 feet by actual measurement, beyond which the person began to disappear from the feet up as he moved to the north, and at a distance of 25 feet from the track the station at Millbrook could be seen. This witness further testified that while sitting in his car in the road 50 feet east of the crossing, he observed the approach of both a freight and a passenger train from the north, and that he could see "right much of the top of the engine" at about 1,400 feet, "over half the engine" at about 1,200 feet, and "all the engine" at 925 feet north of the crossing.

Plaintiff Branch gives a narrative of the accident. On direct examination he testified: "The road . . . goes up a little knoll with bushes on both sides. I bears right and gets straight to go across the railroad and just as I get by these bushes and there you are on the track. I peeps around to see what was coming. I was listening all the time, too. I peeped around to see what was coming and there the train was and the train caught us right there. It knocked me unconscious and killed McKinley Jeffries. As I turned here and started up towards . . . the crossing, my back was exactly to the train . . . I guess I was driving about 5 or 10 miles an hour as I approached the crossing . . . in second gear . . . When I got by the tree I didn't see anything, no train in sight; neither did I hear one. I proceeded on the track and when I crossed the first sidetrack . . . I looked around, nothing coming from Raleigh, and when I peeps around McKinley, the train was there and nothing we could do . . . When I crossed the track next to main line, there was no train in sight at that time . . . It was Sunday when I had the wreck and it was Sunday when I remembered . . . I didn't know what happened to me, whether the train hit me or not." Then on cross-examination, in answer to question, "What kept you from seeing the train?" he said, "It hadn't got up there"; and then, in substance, that if the train was on the track it was out of sight, and it would be out of sight 75 feet down, "unless you were on the track—main line," and, continuing, "I can't remember seeing any train, only thing I know is they say the train hit us. The way it hit us it couldn't be running no slower than 70 miles. I didn't see it. That is what I told the Coroner when I was examined before him; told him I never had seen the train . . . that 'all that time I didn't hear any train, so when I got to the railroad I took right across and when I started across I don't know anything else. That is the last that I can remember.' I didn't hear anything and nothing to stop me. When I got to the track I took right on across . . . I didn't know a train had hit us until I came from the hospital . . . When I goes across the sidetrack I was looking towards Raleigh; I looks around north to see what was coming and nothing was coming."

Plaintiff Branch further testified: "As I started across the track no whistle was blowing and no bell was ringing. I had my glass down. I

was listening." His father testified that when the train passed that morning he was on his back porch and that "whistle didn't blow and the bell didn't ring." On the other hand, the engineer and fireman and others who were in the immediate neighborhood testified that the whistle blew for Millbrook and also for the crossing in question, and that the automatic bell was ringing and continued to ring until after the automobile was hit.

The father of plaintiff Branch, on being asked, "Your boy drove over that crossing every day?" answer, "No, sir, not every day. My son knew all about this crossing. I suppose he knew all about those bushes."

The fireman, as witness for defendants, testified: "I was in the fireman's seat box on the left side of the engine. . . . I saw the automobile, I suppose we were 1,500 feet from the crossing, before it went behind this bunch of trees coming up parallel with the track, and I saw it come around from behind a bunch of trees and I thought he was going to stop. He was running very slow . . . toward the railroad, and when he came up to the track I realized he was not going to stop, and I hollered to the engineer. Up to that time I had thought he was going to stop . . . the whistle was being blown at that very time . . . the engineer put on the brakes and emergency . . . there is nothing else an engineer can do under those circumstances." Then on cross-examination this witness stated that this train was on schedule of 60 miles per hour, that it was making schedule, and was on time.

The acts of negligence of defendants, as alleged by plaintiffs, in their complaint, briefly stated, are these: (1) The operation of the train at a negligent and dangerous rate of speed of approximately sixty miles per hour as it approached the crossing in question. (2) The failure to give any signal of the approach of the train, either by ringing of bell or blowing of whistle.

Defendants in answer filed deny plaintiffs' allegations of negligence and, for further answer and defense, aver as to death of Jeffries (1) the negligence of driver of the automobile, as sole proximate cause, and (2) the contributory negligence of Jeffries, in numerous specific respects, and as to Branch, his sole negligence and contributory negligence in respects specified.

Defendants, having reserved exception to refusal of the court to grant their motions for judgment as in case of nonsuit at the close of evidence for plaintiffs, renewed such motions at close of all the evidence. The motions were then allowed.

From judgments pursuant thereto, plaintiffs appeal to Supreme Court, and assign error.

*Thos. W. Ruffin for plaintiff, appellant, Jeffries.*
*Ellis Nassif and Douglass & Douglass for plaintiff, appellant, Branch.*
*Murray Allen for defendants, appellees.*

WINBORNE, J.   In considering the challenge to the correctness of the ruling of the court below in sustaining motions of defendants, respectively, for judgments as of nonsuit at the close of all the evidence, C. S., 567, "defendant's evidence, unless favorable to the plaintiff, is not to be taken into consideration, except when not in conflict with the plaintiff's evidence, it may be used to explain or make clear that which has been offered by the plaintiff." *Harrison v. R. R.,* 194 N. C., 656, 140 S. E., 598; *Hare v. Weil,* 213 N. C., 489, 196 S. E., 848; *Sellars v. Bank,* 214 N. C., 300, 199 S. E., 266; *Crawford v. Crawford,* 214 N. C., 619, 200 S. E., 378; *Funeral Home v. Ins. Co.,* 216 N. C., 562, 5 S. E. (2d), 820; *Godwin v. R. R.,* 220 N. C., 281, 17 S. E. (2d), 137.

When the evidence in the present record, so considered, is taken in the light most favorable to each of the plaintiffs, we are of opinion that the court properly ruled that the evidence is insufficient to take either case to the jury.

In so far as the Branch appeal is concerned, the ruling of the court finds support in a long line of decisions recently reviewed in *Godwin v. R. R., supra; Miller v. R. R.,* 220 N. C., 562, 18 S. E. (2d), 232; *McCrimmon v. Powell, ante,* 216, 19 S. E. (2d), 880.   When tested by the principles there applied, the evidence here plainly shows that plaintiff Branch, the driver of the automobile, was guilty of negligence which proximately, at least, contributed to his injury.   He does not say that he could not have seen the train.   He merely says that he did not. "This manifests negligence."   *Tart v. R. R.,* 202 N. C., 52, 161 S. E., 720; *Eller v. R. R.,* 200 N. C., 527, 157 S. E., 800; *Bailey v. R. R.,* 196 N. C., 515, 146 S. E., 135.; *Harrison v. R. R., supra.*   "The law is not able to protect one who has eyes and will not see—ears and will not hear," *Stacy, C. J.,* in *Harrison v. R. R., supra.*   Also in *Tart v. R. R., supra.*

Moreover, as related to the Jeffries case, there is nothing in the record from which it may be inferred that, at the time and place of the accident, in a rural section, the train of defendants was being operated at an unlawful or negligent rate of speed.   Hence, if it be conceded that defendants were required to give a signal of the approach of its train at the crossing in question, and failed to do so, it is clear from the evidence that the negligence of Branch was such as to insulate negligence of defendants, and that his negligence was the sole proximate cause of the collision between his automobile and the train of defendants in which Jeffries lost his life.   This conclusion is in keeping with well established

principle, and finds support in numerous cases in this State, among which are: *Ballinger v. Thomas,* 195 N. C., 517, 142 S. E., 761; *Herman v. R. R.,* 197 N. C., 718, 150 S. E., 361; *Hinnant v. R. R.,* 202 N. C., 493, 163 S. E., 555; *George v. R. R.,* 207 N. C., 457, 177 S. E., 324; *S. c.,* 210 N. C., 58, 185 S. E., 431; *Smith v. Sink,* 211 N. C., 725, 192 S. E., 108; *Powers v. Sternberg,* 213 N. C., 41, 6 S. E. (2d), 808; *Murray v. R. R.,* 218 N. C., 392, 11 S. E. (2d), 326; *Chinnis v. R. R.,* 219 N. C., 528, 14 S. E. (2d), 500; *Reeves v. Staley,* 220 N. C., 573, 18 S. E. (2d), 239; and *Butner v. Spease,* 217 N. C., 82, 6 S. E. (2d), 808.

As stated by *Devin, J.,* in the *Chinnis case, supra,* "Conceding that there was evidence of failure on the part of defendant to sound whistle or bell to give warning of the approach of the train to the crossing, it is clear that the active negligence of the driver of the automobile, subsequently operating, was the real efficient cause of the injury to plaintiff's intestate . . . The negligence of the driver of the automobile was patent. It intervened between the failure of the defendant to give warning of the approach of the train to the crossing and the injury to plaintiff's intestate, and it began to operate subsequent to any act of negligence on the part of defendant, and continued to operate to the instant of injury." Here, moreover, the driver of the automobile "knew all about this crossing," and, though there was nothing to obstruct his view, he drove his automobile, at speed of five to ten miles an hour, thirty or forty feet to and on the crossing in the face of a fast moving train without seeing it, which manifestly he could have seen in the exercise of due care. He was running his automobile into a known zone of danger, and he failed to see the obvious in broad daylight. Furthermore, at the rate of speed the automobile was being driven, it is a matter of common knowledge that Branch could have stopped it almost instantly. In such situation, even if it be conceded that the defendants were required to give a signal of this crossing and failed to do so, it is manifest that that would not have resulted in injury and death of Jeffries but for the subsequent gross negligence of the driver of the automobile, to which the collision must be attributed as the sole proximate cause. *Butner v. Spease, supra; Reeves v. Staley, supra.*

The judgments below are
Affirmed.

SEAWELL, J., dissents as to Jeffries.