EVELYN T. RICE, ADMINISTRATRIX OF WILTON A. RICE, DECEASED, v.
CITY OF LUMBERTON.

(Filed 19 March, 1952.)

**1. Trial § 22b—**

On motion to nonsuit, defendant's evidence is not to be considered except when not in conflict with plaintiff's evidence, in which event it may be considered to explain or make clear that which has been offered by plaintiff.

**2. Trial § 22a—**

On motion to nonsuit, plaintiff's evidence and so much of defendant's evidence as is favorable to plaintiff or tends to explain and make clear plaintiff's evidence, will be considered in the light most favorable to plaintiff.

**3. Municipal Corporations § 12—**

A municipal corporation in distributing electricity for profit is regarded as a private corporation, and in such capacity is liable to persons injured by the actionable negligence of its servants, agents and officers.

**4. Electricity § 6—**

An electric company is under duty to exercise that degree of care which an ordinarily prudent man would exercise in dealing with such a dangerous instrumentality, which care, in regard to high voltage wires carrying a lethal current, is the utmost care and prudence consistent with the practical operation of its business.

**5. Electricity § 7—**

When an electric company has notice of a broken wire it is under duty to repair it within a reasonable time under the circumstances; but when the wire carries a high voltage and the circumstances are such that a reasonably prudent man would immediately cut off the current, it is under duty to do so and to keep the current off until proper precautions are taken to prevent danger to persons or property.

**6. Same—Evidence of negligence of electric company in failing to turn off current after notice of broken wire held sufficient for jury.**

Plaintiff's intestate was electrocuted by current from a primary high voltage wire which had fallen in his yard during a thunderstorm. The evidence tended to show that some twenty-five or thirty minutes prior to the fatal accident, intestate's next door neighbor had telephoned defendant's power station and reported to its superintendent that there "was a wire down" on the street and that the lights were out, that a second call was made after the accident, and that linesmen arrived some forty-five minutes after the first telephone call. The evidence further disclosed that current along the line serving this section could have been turned off immediately by a switch in the power station. *Held:* The evidence was sufficient to be submitted to the jury on the issue of negligence of the power company, and nonsuit was improvidently entered.

**7. Negligence § 11—**

A person *sui juris* is under duty to exercise that degree of care for his own safety which is commensurate with the obvious danger.

**8. Electricity § 10—**

The evidence tended to show that intestate came out of his house to help his father, who had been knocked down by current just after driving up in an automobile, that it was dark, that a high voltage wire had become entangled under the automobile, that intestate was not warned by a passenger in the car until he was "right against the automobile," and that intestate was electrocuted when he came in contact with the car or wire. *Held:* The evidence does not show contributory negligence as a matter of law on the part of intestate.

APPEAL by plaintiff from *Williams, J.,* at May Term, 1951, of ROBESON. Civil action to recover damages for alleged wrongful death.

The record on this appeal discloses these facts to be uncontroverted: (1) Wilton A. Rice, intestate of plaintiff, domiciled in Robeson County, North Carolina, came to his death on night of 18 May, 1950, when he came in contact with an electric wire in the front yard of his home outside, and east of the corporate limits of the town of Lumberton, North Carolina. (2) Plaintiff Evelyn T. Rice has been duly qualified as administratrix of the estate of Wilton A. Rice, deceased, and summons in this action was issued 8 September, 1950. (3) The city of Lumberton, located in said Robeson County, is a municipal corporation engaged not only in the usual duties and activities pertaining to such corporations, but, in addition thereto, in furnishing electric energy for hire to patrons within and outside its corporate limits,—the current being purchased by it from Carolina Power and Light Company. (4) Prior to 18 May, 1950, said town had purchased the wires, instruments and attachments, which had been used by private ownership, to distribute to retail customers electric energy outside of its corporate limits for gain. And (5) prior to and on said date Wilton A. Rice lived in a residence which was supplied with electricity by defendant for gain.

Plaintiff alleges in her complaint that on the evening of 18 May, 1950, while her intestate was at his home, his attention was called to his front yard, where an automobile had driven up, and he went immediately and found his father, and others, at, or in the automobile and that his father was unable to get away from the automobile; that the intestate immediately started to his father to help him out of said automobile and came in contact with one of the wires of defendant's lighting system that was down in the dark on the premises; that the wire was highly charged with electricity, and the intestate was instantly electrocuted thereby and died before reaching his said father; and that the intestate had no knowledge that any wire was down in the yard, or was entangled with said automobile, and on account of the darkness was unable to see the wire.

Plaintiff also alleges in her complaint that the death of her intestate was proximately caused by the negligence of defendant in that, among other things, defendant, in operating the system of electric wires and

appliances in the vicinity where intestate of plaintiff lived, failed (1) to properly insulate the wires; (2) to properly equip same with switches, jacks and other safety devices; (3) to respond to the notice that the wire which caused death of plaintiff's intestate was down, although it knew of the lack of safety equipment; and (4) to exercise due care to keep its said electric lighting system in reasonably safe condition, and free of danger from exposed live wires.

Plaintiff further alleges in her complaint that she has duly filed claim with defendant and it has failed to pay any part of it; and that this action was instituted within one year next after death of her intestate.

Defendant, answering the complaint, admits the allegations in respect to (1) filing claim with defendant, and its failure to pay same, and (2) the institution of this action, but denies, in material aspect, other allegations as above detailed.

And defendant, further answering, set up a further specific defense, which is summarized as follows:

"Defendant denies that it was negligent in any manner whatever; that the exposure of the live wire which caused the death of plaintiff's intestate was due to an act of God, and beyond the control of defendant; that the sole and proximate cause of the injury and death of plaintiff's intestate was his own negligence, and contributory negligence, as alleged . . . which defendant pleads as a bar to any recovery herein."

Upon the trial in Superior Court, the evidence in chief offered by plaintiff tends to show these relevant facts as variously expressed by the witnesses as of the time and at the scene of the death of Wilton Rice on 18 May, 1950:

The home of Wilton Rice was located on Linwood Avenue, also referred to as Linden Avenue, at a point about three hundred yards, or three city blocks, from the intersection of the avenue with Highway 74, and about a mile and a half from the power station in town. The house itself is probably 15 or 20 feet from the street, and has just a small yard between it and the street, "just a few feet." The Wilton Rice lot adjoined the residence lot of Mr. and Mrs. Ernest Todd,—the two houses being about 100 to 150 feet apart. There were "nothing but small trees in the Wilton Rice yard," but there were limbs and pecan trees on the Todd lot,—50 to 100 feet from the Rice house.

There was an electric line along Linwood Avenue for the distribution of electric current to residences, one pole being between the Rice and the Todd houses. The line was built by George W. West, who sold it to the city of Lumberton in the year 1937. It had other lines off from this line into houses. The primary wire was a "2200 or 2300 volt line."

Late that afternoon "there was a severe electrical windstorm" (testimony of George W. West). At five o'clock "it was quite windy . . . bad

weather all afternoon,—just a continuation of it" (testimony of Ernest Todd).

Later "just after about coming dark time . . . a good bit of rain fell and wind blowing" (testimony of George W. West). And the Todds testified to the effect that there was some lightning and thunder, and that a live limb, two inches in diameter, with "a lot of foliage on it," split off a pecan tree in their yard and was hanging from the tree, and an electric wire was hanging below the limb. Ernest Todd testified: "The wire was down right of my house about 10 feet,—laying across my front door steps; it was also hanging from the pole across through the trees, across to his house . . . The first time I saw it, it was in the tree, limbs beating against it. The lights had been out for 30 minutes. It was undoubtedly down." Lights were out in that section, including the Rice and Todd houses.

And W. O. Rice, uncle of Wilton Rice, gave this narrative: (Direct examination) "Woodie Rice was in the car with me when I went up to the Wilton Rice residence on the evening of May 18th. Woodie Rice is Wilton's father. It was dark when I drove up there,—it was just first dark. I suppose it was around 8:30. The lights were burning on my car. I reached the residence by going up the road that turns off Highway 74 and turned in to the Wilton Rice lot. As we turned it caused my lights to shine to the back of the Wilton Rice residence; that is back through his back yard. I did not see any lights in his residence when I turned up there. As I turned up in his yard I heard something scrub under my automobile and Woodie Rice got out of my car and he fell, and he fell for the third time, and the fourth time he fell, he got up. He got clear and Wilton Rice came out of the house and as he came around and touched my automobile, he fell. Wilton got up and fell again; that was the last time. I could not see any wire out there. I found there was a wire tangled up with my car after Wilton Rice had fallen. After Wilton Rice fell, I got out of the automobile . . . and saw Wilton laying beyond at the back of my automobile and then I recognized there was a wire and sparks of fire were burning and I could see the wire . . ."

Then W.O. Rice, on cross-examination, continued: "When my brother and I drew up in the yard I felt something scrub under my car. I didn't know what it was, and when my brother got out and was knocked down, he said there was a hot wire or something . . . I was sitting in the car. I did not feel the current of electricity. My brother did not call Wilton Rice. I don't think Wilton could have seen his father when he came out. As he came out the car lights were burning, and it was dark except where the lights were shining . . . I did not tell Wilton not to come about the car. I told him his father said there was a hot wire down in there and I told him to stop. He was right against the automobile when I told him. I have an idea he touched my automobile after I told him that . . ."

Mrs. Evelyn Rice, widow of Wilton Rice, testified: That she was at home that night; that they were eating supper; that the lights were off at the time, had been off about 30 or 45 minutes; that she did not know anything about a wire being down on the outside; that Wilton saw the lights of the automobile as they shone by the kitchen window, and went out the front door; that she was in the house when he went out, but went out after that; that the car was just a few feet from the front door,— "just a little way . . . 8 or 10 feet"; that it was 8 :30; that when she got out there, she did not see any wire except from the light where it was burning Wilton's leg; and that there was no light out there except at the front of the car.

Mrs. Todd testified that she called the power station 25 or 30 minutes before Wilton Rice was killed and "told them there was a wire down on Linwood Avenue and . . . the lights were out," and that she called a second time and "at that time Rice had been killed."

And plaintiff's evidence tends to show that the linemen of the city electric department did not arrive until after Wilton Rice was killed; and that it was about 45 minutes after Mrs. Todd notified them that any lineman came to fix the wires,—quoting Ernest Todd, "45 minutes before they got to the end of the street where we lived,—they could have been on the other end of the line."

Plaintiff also offered the testimony of a line foreman of the Carolina Power and Light Company in respect to use of jacks, cut-outs and switches, and among other things he stated that "they have switches down at the town power plant to cut out the current in the section in which plaintiff's intestate was killed," continuing, "I am not familiar with the distribution of the town of Lumberton. I know they have switches at the sub-station. I am talking about switches at the power house. I know they have switches there. They could have killed the whole thing here at the power house."

Defendant then offered the testimony of Johnny McNeill, superintendent of the water and light department of the city of Lumberton, and of Willie McNeill, connected with the power and light system of the city as assistant to the superintendent.

Johnny McNeill testified in pertinent part: "I remember the occasion 18th May, 1950 . . . getting a telephone call from Mrs. Todd . . . said the wire going to her house was down and she didn't have any lights. I told her all right, that as soon as one of the boys came in I would send him out. We had two storms that afternoon. . . . My boys started after the first storm,—around 3 :30. There was wind, rain and lightning and we had never quit when Mrs. Todd called me. The second storm was at first dark,—along about dark,—windstorm. We had six men working on the wires, two different crews. We had more than 25 calls in regard to

disrupted electrical service . . . As a call comes in, we have a tablet and put down each call so that the boys will get the call and see about all of them before we quit. When the boys come in, they take the list and go out and when they come back, we give them the other list, keep on that way until we catch up. Due to the storm that day we had several places where the wires were out, transformer fuses knocked, wire broken down by trees; . . . wires were broken by trees over the river, out at the Ada McLean Mill, Old National Mill, North Lumberton and East Lumberton, in fact we had the same thing all over town.

"When I got the second call from that section where the Wilton Rices lived, Mrs. Todd telephoned the second time informing me that someone was hurt, Willie Mac came in as the phone was ringing and he answered, and he went directly to the scene. Craven Pridgen was with him."

The witness continued: "The jacks we use in our system are not timed, they are single jacks. They use some in REA with three timing switches. We don't use that kind. If we have a long circuit and we do much work on it, we put jacks so we can kill the current and be able to work on the line. There wasn't any jacks in that particular area. It was off the main line and did not have jacks. A jack would not have cut off the current automatically if the line had fallen down. A cutoff would not have cut off the current unless one wire contacted the other wire. Automatic switches knock out if you have a short circuit; if they fall on the ground they do not knock out, don't have sufficient current. . . . The switches we have will not knock out when a wire falls on the ground . . . there isn't enough conductor there—unless they come in contact with another wire . . . The system we use in Lumberton is the latest improved system of electric wiring, of general and approved use. We have a modern switchboard, as modern as can be at present; was installed about two years ago, that is switching equipment. We could have cut off the current at the power house. If we had . . . we would have cut off more than 2000 homes. We do not cut off the current unless we have a primary wire on the ground. . . . When it was reported to me that a wire was down . . . unless I know it is a primary wire, I do not cut off the whole current of that area . . . When I first got the message from out there, all the information I had was the lady said the wire was down and she didn't have any lights. I told her I would get to her as soon as I could contact one of the men. And then I stayed until someone came in and when they came in they went out there. The lady called again about first dark . . . I did not have information where to find them when the first message came in. I tried to get information from the lady. I asked where she lived; in fact I didn't understand who she was. I did know her, but at that time I didn't remember who she was. I asked whether she lived back of George West or go to Taylor's and turn in, so I would

know the exact location. She said she lived back of the George West store, and that is the information I gave out. It was ten or ten thirty that night when the crewmen got through working on the wires. They had been working from three that afternoon. They hadn't had anything to eat. I had to stay in the powerhouse and direct the work.

Then on cross-examination, this witness continued in pertinent part: ". . . We supply East, North and West Lumberton, only residences, don't supply the mills. I would say there are . . . one hundred and fifty at East Lumberton, including the territory we took over from George West. The primary line that fell down on the 18th of May, 1950, running north from 74 before the end of it is reached, goes out as far as Mr. Vander's on the Seventh Street road, probably a mile. The highway is an extension of Fifth Street, and the Seventh Street road is the one Pittman lives on. There is considerable settlement around what used to be the old county home . . . We furnish all of them. There are not more than six or eight customers on that primary line from Highway 74 until it gets to Pittman's out on Seventh. We put 2300 volts on a line for six or eight, and that line furnishes the Rice residence. Insulation on that line wouldn't do any good if you come in contact with it. It would kill anybody who came in contact with it; anybody on the ground would make a ground . . . The line Mrs. Rice told us about was the line running up Linwood Avenue and that was the line that fed the customers of Linwood Avenue up to Sandy Pittman's . . . I said that if we had cut off the current at the plant, we would have taken current from 2000 customers. We don't often do that . . . We have the latest equipment . . . gadgets to turn off the electricity . . . We have a way to cut off different sections . . . We can cut off East Lumberton. We have switch controls, one for East Lumberton . . . I know Mrs. Todd, George West's daughter. I knew where she lived at that time."

Then on re-direct examination this witness concluded by saying, "I had on my pad 25 calls. The 25 calls were ahead of the call from East Lumberton—this was one of the last calls that came in. We were working as the calls came in. As the truck would come in, would give them another list."

And Willie McNeill, witness for defendant, testified: "This occasion on the 18th of May, 1950 . . . It was between three and four o'clock . . . had such a hard wind—saw lights go out . . . and came back in. We worked from then on . . . We have two crews, three men on each truck. We worked on through. There were lines down over the city; some . . . over the river on Carthage Road, two . . . the other side of East Lumberton Baptist Church and one beyond Mr. Taylor's. There was a pole knocked down at the corner of Second, at the intersection . . . Second and Fifth Streets, a man ran into it with a truck; had a crew

working there and others jumping from one place to another. Transformer fuses over town were knocked out . . . it was wind and lightning and both will knock them out . . . It was one of the strongest winds I have ever seen . . . There was another blow about 7 :30 . . . Limbs off trees were knocked down, twisted off, not split, but at that particular point, the limb was split. As I drove up to the power station the phone was ringing. Mr. McPhail called me to the telephone. There was a message that there was a wire down up at Mr. Todd's house and they had no lights. I believe she told me that that boy was hurt . . . and I went right on out there. I picked up Craven Pridgen to go out there with me . . . when Craven and I got out there we found a wire on the ground. It was drizzling rain ; we cut the wires down first thing we did ; the other crew came out later on to help. We found a limb the wind had twisted and the limb fell across the wire. One line was down and the wire was on the limb at that time. We cut the limb off the tree. The limb was four inches through,—I measured it. That tree was 12 to 15 feet east of the power line . . . it was a pecan tree. The limb ran above the wire,— had twisted off above there about 5 or 6 feet above the wire,—made the limb fall on top of the wire—that was the cause of the wire being down on the ground . . . A green limb could burn a wire in two, act as a conductor . . . The limb was across one wire, and other on the ground—one wire down and one was up."

Then on cross-examination, the witness Willie McNeill continued, in pertinent part : "We had two primary wires out there. It takes two to make a circuit, and the two out there were charged with 2300 volts . . . Switch at the power house did not kick out. I knew that the wire on the ground was burning when I went out there on Linden Avenue . . . If the switch at the power house had kicked out, it would have been out, and it could have been turned off at the power house . . . I didn't get but one message to go out there . . . I hadn't heard anything about the first call 30 minutes before the second one . . . Mr. McNeill told about their calling him and I told him I was going right down there . . ."

Motion of defendant, renewed at close of all the evidence, for judgment as of nonsuit, was allowed, and to judgment, pursuant thereto, dismissing the action, plaintiff excepted and appeals therefrom to Supreme Court, and assigns error.

*L. J. Britt and Varser, McIntyre & Henry for plaintiff, appellant.*
*McLean & Stacy for defendant, appellee.*

WINBORNE, J.  The assignment of error, determinative of this appeal, is directed against the ruling of the trial court in allowing motion of defendant, renewed at the close of all the evidence, for judgment as of nonsuit under provisions of G.S. 1-183.

In considering such motion, "the defendant's evidence, unless favorable to the plaintiff, is not to be taken into consideration, except when not in conflict with plaintiff's evidence, it may be used to explain or make clear that which has been offered by plaintiff," *Stacy, C. J.,* in *Harrison v. R. R.,* 194 N.C. 656, 140 S.E. 598, citing *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769. This rule is applied also in these cases: *Hare v. Weil,* 213 N.C. 484, 196 S.E. 869; *Crawford v. Crawford,* 214 N.C. 614, 200 S.E. 421; *Tarrant v. Bottling Co.,* 221 N.C. 390, 20 S.E. 2d 565; *Jeffries v. Powell,* 221 N.C. 415, 20 S.E. 2d 561; *Gregory v. Ins. Co.,* 223 N.C. 124, 25 S.E. 2d 398; *Pappas v. Crist,* 223 N.C. 265, 25 S.E. 2d 850; *S. v. Oldham,* 224 N.C. 415, 30 S.E. 2d 318; *Atkins v. Transportation Co.,* 224 N.C. 688, 32 S.E. 2d 209; *Buckner v. Wheeldon,* 225 N.C. 62, 33 S.E. 2d 480; *Humphries v. Coach Co.,* 228 N.C. 399, 45 S.E. 2d 546; *Perry v. Hurdle,* 229 N.C. 216, 49 S.E. 2d 400; *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307; *Chesser v. McCall,* 230 N.C. 119, 52 S.E. 2d 231; *Winfield v. Smith,* 230 N.C. 392, 53 S.E. 2d 251; *Carson v. Doggett,* 231 N.C. 629, 58 S.E. 2d 609; *Ervin v. Mills Co.,* 233 N.C. 415, 64 S.E. 2d 431; *Register v. Gibbs,* 233 N.C. 456, 64 S.E. 2d 280.

Therefore, taking the evidence offered by the plaintiff, and so much of defendant's evidence as is favorable to the plaintiff, or tends to explain and make clear that which has been offered by the plaintiff, in the light most favorable to plaintiff, this Court is of opinion, and holds that there is sufficient evidence to take the case to the jury on the issue of negligence of defendant.

A municipal corporation, engaged in the business of supplying electricity for private advantage and emolument is, as to this, regarded as a private corporation,—and in such capacity, is liable to persons injured by the actionable negligence of its servants, agents and officers. *Fisher v. New Bern,* 140 N.C. 506, 53 S.E. 342; *Harrington v. Wadesboro,* 153 N.C. 437, 69 S.E. 399.

The principle is recognized and applied in numerous other cases before this Court. See *Grimesland v. Washington,* 234 N.C. 117, 66 S.E. 2d 794.

And this Court declared in *Helms v. Power Co.,* 192 N.C. 784, 136 S.E. 9, that: "Electric companies are required to use reasonable care in the construction and maintenance of their lines and apparatus. The degree of care which will satisfy this requirement varies, of course, with the circumstances, but it must always be commensurate with the dangers involved, and where the wires maintained by a company are designed to carry a strong and powerful current of electricity, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its business, to avoid injury to those likely to come in contact with its wires."

And in *Small v. Utilities Co.*, 200 N.C. 719, 158 S.E. 385, it is said that "Due to the deadly and latently dangerous character of electricity, the degree of care required of persons, corporate or individual, furnishing electric light and power to others for private gain, has been variously stated." Then after reciting such expressions, the Court said: "In approving these formulae as to the degree of care required in such cases, it is not to be supposed that there is a varying standard of duty by which responsibility for negligence is to be determined. . . . The standard is always the rule of the prudent man, or the care which a prudent man ought to use under like circumstances. What reasonable care is, of course, varies in different cases and in the presence of different conditions."

And these principles apply in cases of broken high tension wires. Diligence must be exercised to repair any breaks in such wires. To permit a broken wire charged with electricity of high voltage unnecessarily to remain in or near a highway is evidence of negligence. *Fisher v. New Bern, supra.* And this is true where the company has notice of the condition, regardless of the cause which produced it. However, under some circumstances, in order to show negligence in this respect, a reasonable time to repair it must have elapsed. And what is reasonable time depends on the circumstances of each case. On the other hand, where there is a broken wire charged with electricity of high voltage, extending into a street or highway creating imminent danger to others, whether sufficient time has elapsed to make repairs is not the test of negligence. But where an electric company receives notice that its wire, charged with electricity of high voltage, is down in a street or highway it should take speedy and efficient action. And, if the situation be such that a reasonably prudent person would cut off the current, this should be done, and the current kept off until proper precautions are taken to prevent danger to persons or property from the fallen wire, and until it is ascertained that it is safe to turn it on. Where, however, the wire is down at a place where the company has no reason to anticipate that anyone will be injured thereby, it is not negligent in failing to cut off the electricity at the first opportunity. See 29 C.J.S. 591, Electricity 45; 18 Am. Jur. 480, Electricity 87-95; *Fisher v. New Bern, supra; Osborne v. Tennessee Electric Power Co.*, 158 Tenn. 278, 12 S.E. 2d 947; *Lutolf v. United Electric Light Co.*, 184 Mass. 53, 67 N.E. 1025; *Mayor v. City of Madison*, 130 Ga. 153, 60 S.E. 461; *Lexington Utilities Co. v. Parker*, 166 Ky. 81, 178 S.W. 1173; *Kentucky and West Virginia Power Co. v. Riley*, 233 Ky. 224, 25 S.E. 2d 366; *Hayden v. Carey*, 182 Wis. 530, 196 N.W. 218.

Now, as to the issue of contributory negligence pleaded in answer of defendant: The law imposes upon a person *sui juris* the obligation to use ordinary care for his own protection, and the degree of such care should be commensurate with the danger to be avoided.

COMMERCIAL SOLVENTS *v.* JOHNSON.

In the light of this principle, and under the circumstances which the evidence being considered tends to show, contributory negligence on the part of intestate of plaintiff is not established as a matter of law. Rather, the evidence presents a case for the jury under proper instruction by the trial judge.

For reasons stated, the judgment of nonsuit is
Reversed.