AMELIA FAIRCLOTH, BY HER NEXT FRIEND, MRS. CHELLIE FAIRCLOTH v. ATLANTIC COAST LINE RAILROAD COMPANY
and
MARTHA JO ANNE FAIRCLOTH, BY HER NEXT FRIEND, MRS. CHELLIE FAIRCLOTH v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 20 November, 1957)

1. **Railroads § 4—Evidence held to disclose that negligence of driver was sole proximate cause of crossing accident.**

   Evidence disclosing that the truck in which plaintiffs were riding as passengers ran into the side of a freight train between the first and second cars, after the engine and tender had passed, that the truck left skid marks for a distance of 35 feet prior to the point of impact, and that from a point more than 96 feet from the crossing the lights of the locomotive could be seen for more than 2,000 feet, *is held* to show gross negligence on the part of the driver continuing to the moment of impact, and constituting the sole proximate cause of the accident so as to preclude recovery against the railroad company, notwithstanding evidence of negligence on the part of the engineer in failing to give warning of his approach by bell or whistle.

2. **Same—**

   The sole purpose of warning by bell or whistle is to give notice of the approach of the train, and members of a train crew are not required to foresee that the operator of a motor vehicle fully able to observe the headlights on the locomotive for nearly half a mile will rely solely on his hearing and not use his sight to ascertain the train's approach.

APPEAL by plaintiffs from *Morris, J.,* May, 1957 Term, SAMPSON Superior Court.

Civil actions to recover for personal injuries received in a crossing accident at Autryville, North Carolina. The accident occurred on Saturday, November 5, 1955, at about 9:50 at night. The plaintiffs, at the time the complaints were filed, were respectively 13 and nine years of age. The village of Autryville has a

population of about 500. The defendant's rail line runs near east and west. Approaching from the west along the track the Hall Bridge Road crossing is visible for more than 1,500 feet. Hall Bridge Road runs near north and south and crosses the defendant's track in the edge of the village. The road is paved and about 20 feet wide. From the point where it crosses the defendant's track the road is straight to the south for 615 feet. West of the highway and not closer than 75 feet, and south of the rail line and not closer than 96 feet, is a wooded area. From a point in the highway 96 feet south of the crossing a train approaching from the west is visible for probably 2,000 feet. At the time of the accident there was a railroad crossing sign (cross-arms) on the right near the track. Immediately prior to the accident the plaintiffs were riding north on Hall Bridge Road in the cab of a pickup truck driven by their father, J. C. Faircloth. Also in the cab were the grandmother of the plaintiffs and their cousin, Judy Faircloth. The grandmother was sitting on the right with Judy in her lap and the plaintiffs were sitting between the grandmother and the driver. The window on the driver's side of the cab was closed. The window on the other side was broken out.

The plaintiffs testified that as the truck rounded the curve 615 feet south of the crossing, "they were all talking." They remembered nothing more until they regained consciousness in the hospital. The pickup truck ran into the moving train at the crossing, apparently striking the rear of the first freight car and the front of the second. Skid marks extended back from the point of impact about 35 feet to the south. Skid marks nine and one-half feet to the side extended in the direction the truck was carried by the impact. It came to rest 47 feet to the east of the road and 15 feet to the south of the track. The driver, the grandmother, and Judy Faircloth were killed. The two plaintiffs received serious, permanent and disfiguring injuries. The father had worked near the crossing and was familiar with it.

The defendant's train consisted of the locomotive, 50 or 60 feet long, and 24 freight cars, each estimated to be about 35 feet long. Only one train, the freight, ran east on Saturday. It passed usually between eight and twelve o'clock at night. Apparently the train was not scheduled to stop at the village of Autryville and apparently no station was maintained there.

The plaintiffs' witnesses, Mrs. Hill, her daughters, Mrs. Williams and Mrs. Van Ness, were in Mrs. Hill's apartment which was located in a building 65 feet north of the railroad track and 35 feet east of the Hall Bridge Road. The building consisted of a warehouse to the west, Mrs. Hill's apartment in the middle, and another apartment to the east. The Hill apartment consisted

of four rooms; two bedrooms on the south next to the track, the kitchen and livingroom on the north, away from the track.

Mrs. Hill testified on the night of the accident there were five adults and five children in the apartment. They were in the kitchen on the side of the house away from the track. Mrs. Williams testified: "We told my sister, Mrs. Van Ness, how close the train would come to our apartment and how fast it would go by. We were especially listening for the train to blow and when it blowed we would have time to get outside . . . but the train didn't blow. The first thing we knew we had to jump up from the table and run to the window at the back of the apartment in the bedroom . . . by the time we had done that the engine was by the window and the only recognition we had of the train approaching was the sound of it. No bells were ringing before the train crossed the crossing at our apartment."

Mrs. Van Ness testified: "No whistle was blown nor bell rung before and as it crossed the crossing. . . . I would say the train was running about 50 miles per hour. All I could see was the flash of the lights between the cars. I saw sparks from the wheels."

H. C. Bullard testified: "I am familiar with the crossing. I have passed it a thousand times or more. I made observations of it on the night of the accident. There were street lights burning. Well, I looked down to the left, down the railroad track, and you couldn't see down the track there, out of that light—that is, towards Fayetteville. The lights shining prevented me from seeing, for one thing, and all the weeds and broom sage, at the time grown up around the track there. * * * I have crossed this crossing a large number of times. There is a lot of traffic over it. . . . This is the main crossing in Autryville of the A.C.L. Track. Plaintiffs' exhibit 2 correctly shows the railroad crossing and sign at the time of the accident. I made my observation that night immediately after the accident. With respect to the cross-arm sign, you couldn't see it on account of the lights that were shining there and then it was grown up around there."

The plaintiff introduced, for the purpose of illustrating the testimony, a map showing the railroad for more than 2,000 feet to the west and 1,100 feet to the east, and the highway from the curve to the south on into the village. This map was filed with the case on appeal.

At the close of the plaintiffs' evidence the court sustained the defendant's motion for nonsuit and from the judgment dismissing the actions, the plaintiffs appealed.

*Maurice Holland, Hubbard & Jones, By: Howard H. Hubbard for plaintiffs, appellants.*

*Poisson, Campbell & Marshall for defendant, appellee.*

HIGGINS, J. For reasons readily apparent, the Court has encountered difficulty in laying down hard and fast rules governing liability in train-automobile grade crossing accidents. "Many cases involving injuries due to collision between motor vehicles and trains at grade crossings have found their way to this Court. No good can be obtained from attempting to analyze the close distinctions drawn in the decisions of these cases, for, as was said in *Cole v. Koonce, supra,* 214 N.C. 188, each case must stand upon its own bottom, and be governed by the controlling facts there appearing." *Hampton v. Hawkins,* 219 N.C. 205, 13 S.E. 2d 227.

It is a matter of common knowledge that a train cannot leave the track; that it cannot be stopped quickly; how quickly depends upon the grade, the speed, and the weight. A 24-car freight train moving 50-55 miles per hour would undoubtedly travel a considerable distance after the application of brakes before it could be stopped.

The plaintiffs in their very excellent brief, however, argue the evidence is sufficient to go to the jury by reason of the defendant's negligent failure (1) to keep a proper lookout; (2) to give timely warning; and (3) to operate at a safe speed. There is no evidence here the train was violating any speed law or regulation. A plaintiffs' witness testified that sparks were flying from the wheels as the train ran through the crossing, indicating that the brakes had been applied. There was no evidence the engineer failed to look or to see what he should have seen, or to do all in his power to stop the train or to slow it down as soon as he was able to see the automobile entering a zone of danger. There is neither allegation nor proof the train did not display proper lights.

Somewhat more troublesome is the factual question whether the evidence is sufficient to show the defendant gave timely warning signals of its approach to the crossing. Three women drinking coffee in an apartment with two other adults and five children neither heard a whistle blow nor a bell ring. Two bedrooms separated them from the track. A warehouse was a part of the building between them and the direction from which the train approached. Another apartment in the same building was to the east. The record is silent as to how far down the track the witnesses could have heard the signals if given. The evidence they were not heard is negative in character.

If it be conceded the warning signals were not given, nevertheless, from the skid marks it is plainly indicative the driver knew of the danger in time to leave skid marks 35 feet south of the crossing. From a point more than 96 feet south of the crossing the driver of the pickup was in a position to see the lights

from the locomotive for more than 2,000 feet. Gross negligence, continuing to the moment the truck crashed into the train, is shown on the part of the driver.

If it be conceded the members of the train crew did not ring the bell and did not blow the whistle, they could not foresee that a driver, fully able to observe the headlights of the aproaching train for nearly half a mile, would rely solely on his hearing and not use his sight to ascertain the train's approach. The purpose of warning signals is to show the approach of the train. "The test by which the negligent conduct of one is to be insulated as a matter of law by the independent negligent act of another, is reasonable foreseeability." *Hayes v. Wilmington*, 243 N.C. 525, 91 S.E. 2d 673. ". . . if it be conceded that defendants were required to give a signal of the approach of its train at the crossing in question, and failed to do so, it is clear from the evidence that the negligence of Branch (the driver) . . . was the sole proximate cause of the collision between his automobile and the train." *Jeffries v. Powell*, 221 N.C. 415, 20 S.E. 2d 561. "The evidence offered by plaintiffs . . . fails to make out a case sufficient for consideration by the jury. It may be fairly doubted that plaintiffs show any evidence of negligence on the part of defendants. But on the other hand, the evidence clearly shows the negligence on the part of the operator of the truck here involved was the sole proximate cause of the collision, and comes within the principles applied in the case of *Johnson v. R. R.*, 214 N.C. 484, 199 S.E. 704; and *Jeffries v. Powell*, 221 N.C. 415, 20 S.E. 2d 561; and cases there cited." *Hensley v. R. R.*, 230 N.C. 617, 54 S.E. 2d 926.

". . . if it be conceded that the defendant was negligent in allowing the corn to grow up on the edge of its right of way and in failing to give warning signal of the approach of its train to the crossing, nevertheless, it is clear that the active negligence of the driver of the automobile . . . was the real, efficient cause of the injury to the plaintiff. It is manifest that the negligence of the husband . . . became the sole proximate cause of the plaintiff's injury." *Jones v. R. R.*, 235 N.C. 640, 70 S.E. 2d 669.

Somewhat divergent views have been expressed by this Court, notably in *Henderson v. Powell*, 221 N.C. 239, 19 S.E. 2d 876; *Butner v. R. R.*, 199 N.C. 695, 155 S.E. 601; *James v. R. R.*, 236 N.C. 290, 72 S.E. 2d 682. "Insulated" and "intervening" negligence have been discussed frequently in the decided cases. Decision in this case is determined by the application of the law of proximate cause, which makes unnecessary any discussion of insulated or intervening negligence.

The nonsuits entered in the court below were in accordance with established authorities, and the judgment is

Affirmed.