ROLAND J. BROWN, ADMINISTRATOR OF THE ESTATE OF OSSIE D. BROWN, DECEASED v. ATLANTIC COAST LINE RAILROAD COMPANY
— AND —
WILLIAM E. PHILLIPS, SR., ADMINISTRATOR OF THE ESTATE OF WILLIAM E. PHILLIPS, JR., DECEASED v. ATLANTIC COAST LINE RAILROAD COMPANY

No. 6911SC98

(Filed 2 April 1969)

**1. Railroads § 5— crossing accidents — duty of motorists**

Where a driver knows about a railroad crossing, he has a duty to approach such crossing with care and at a speed which would permit him to stop the vehicle if necessary to avoid a collision with an oncoming train.

**2. Railroads § 5— crossing accidents — obstructed view of crossing — intervening negligence of motorist**

In an action by plaintiff administrators to recover for the wrongful death of their intestates, evidence disclosing that the truck in which intestates were riding as passengers approached a railroad crossing over a city street, that the driver's view of the crossing was obstructed on the right by several buildings and oil storage tanks, that the driver of the truck, who was familiar with the crossing, traveled at a rate of speed which did not permit her to stop after passing the buildings and before reaching the tracks, and that upon discovering defendant's oncoming train the driver accelerated her speed in order to go around the front of the train and that a collision resulted, *is held* to show that the negligence of the driver was the sole proximate cause of the collision, notwithstanding evidence of negligence on the part of defendant in failing to give warning of the train's approach by horn or whistle.

APPEAL by plaintiffs from *Godwin, S.J.,* 16 September 1968 Civil Session, LEE County Superior Court.

On 6 January 1967 Roland J. Brown, Sr., the administrator of the estate of Ossie D. Brown (Brown), instituted this civil action in his representative capacity against Atlantic Coast Line Railroad Company (defendant) to recover for Brown's wrongful death. On 11 April 1967 William E. Phillips, Sr., (Phillips, Sr.) the administrator of the estate of William E. Phillips, Jr., (Phillips, Jr.) instituted this civil action in his representative capacity against defendant to recover for the wrongful death of his twelve year old son. During the pendency of these actions, the defendant merged with Seaboard Air Line Railroad Company, and the correct corporate name of the defendant is now Seaboard Coast Line Railroad Company. The two cases were consolidated for trial.

At approximately 10:30 p.m. on 12 November 1966 Jean Brown Phillips (driver) was operating a 1966 Ford pickup truck in a westerly direction on Rose Street in the City of Sanford, North Carolina. Brown, the sixty-three year old mother of the driver, was seated to the right of driver in the truck's cab. Phillips, Sr., the driver's husband and the owner of the truck, was seated in the open bed of the truck immediately to the rear of the driver. Gordon Brown (Gordon), the driver's brother and Brown's son, was seated in the open bed immediately to the rear of Brown. Phillips, Jr., was seated between Phillips, Sr., and Gordon.

Rose Street is a four-lane paved road, which is forty-eight feet wide and runs in a generally east-west direction. It is a major thoroughfare in Sanford and has a speed limit of thirty-five miles per hour for vehicular traffic. Chatham Street is a two-lane public road, which is approximately twenty feet wide and runs in a north-

erly direction from the north side of Rose Street forming a "T" intersection. Two lines of railroad tracks are located to the west of Chatham Street. The railroad tracks, which run in a generally north-south direction and which parallel Chatham Street, cross Rose Street at a grade. From the "T" intersection, Chatham Street goes downgrade in a northerly direction, while the railroad tracks are elevated above the grade of Chatham Street. Rose Street is upgrade in a westerly direction toward the railroad tracks. It is approximately twenty-eight feet from the eastern margin of Chatham Street at the "T" intersection to the easternmost railroad track. There are no buildings or other obstructions from the western margin of Chatham Street to the railroad tracks. However, in the corner formed by the eastern margin of Chatham Street and the northern margin of Rose Street, there are three buildings and two tanks for the bulk storage of petroleum products. Since these buildings and tanks effectively block the vision of a motorist who is traveling from east to west on Rose Street, the motorist must reach the eastern margin of Chatham Street before a clear vision of the railroad tracks can be obtained. From that point, the vision is clear for some six hundred feet to the north.

The driver, who stated that at the time in question she was traveling at a speed of thirty to thirty-five miles per hour, testified as follows on direct examination:

"When I got to the edge of Chatham Street, I looked to the right. I looked to the right when I got to the edge of Chatham Street because I could not see to my right until I got to Chatham Street. I could not see to my right until I got to Chatham Street because there were buildings to my right.

When I passed Chatham Street, between Chatham Street and the railroad, I saw this light and then it dawned on me that the light was swirling and I knew then that it was a train. The light was down the track to my right. I did not hear a bell sound nor a whistle blowing; I did not hear a bell sound. I knew then that I could not stop; I was too close, and I swerved to the left and speeded up. Then the train hit the right door where my mother was sitting. I did not hear any signal, bell, or whistle after the collision; I don't remember anything after the collision until I woke up in the hospital. I don't recall when that was, it was that night."

The driver testified as follows on cross-examination:

"When I first realized that the train was coming, I was too close to stop. When I saw that I couldn't stop, I did all I could do,

all I knew what to do; I swerved to the left and speeded up, trying to get across before the train hit. I was probably twenty feet from the train when I seen it. I then drove twenty feet before the collision by my best estimate of the distance. When I realized that I could not stop, I picked up speed in an effort to go around the front of the train."

After the collision the truck and its passengers were on the west side of the railroad tracks.

Phillips, Sr., who stated that the driver was traveling at a speed of about thirty miles per hour, testified as follows on direct examination:

". . . [A]nd we came up close to the intersection of the railroad and Rose Street there, and she swerved suddenly to the left, and when she did it, I turned and looked through the back window to see what caused her to do it. We were past Chatham Street at the time she did that, right at the intersection of Chatham, right about the center of Chatham, when she swerved, on the railroad side of Chatham Street, because we had already passed the corner, right about the edge of the west side of Chatham when she swerved, about twenty feet from the railroad track because I looked in front and didn't see anything.

When I first looked, I was looking at an angle towards Chatham Street and turned to my left, which turned me around across the railroad, to the north. I didn't see anything in front and I turned and when I turned back, I saw the diesel engine light swirling right about five feet from the pickup truck. Before I saw the diesel engine, I did not hear anything. As the truck was proceeding in a westwardly direction along Rose Street toward the grade crossing, I did not hear a train horn nor a train bell ring; I did not hear a train horn sound. From the moment I felt the truck swerve until the truck and train collided, approximately a second or two elapsed, I don't know which. It seemed so fast."

The crossing in question was well marked with signs, both at the crossing itself and on the Rost Street approach. Since the driver and Phillips, Sr., went over the crossing almost daily, they were very familiar with it.

Gordon testified as follows on direct examination:

". . . As we proceeded west on Rose Street, the first thing that was called to my attention just prior to the accident was

— I can't keep it straight, which comes first, either the light flashing or the motor. . . .

Just prior to the time of the collision, when I looked up, I saw a headlight of the train. . . . I did not hear the sound of a bell ringing from that train prior to the collision. Prior to the collision, I did not hear the sound of a horn blown by the train nor a whistle from the train."

Raymond Holt, a witness for the plaintiffs, testified on direct examination that he lived forty yards from the crossing and that he was in the front part of his house at about 10:30 p.m. on 12 November 1967. He further testified as follows:

". . . The first thing that I heard that night, with respect to this accident, was a crash. Prior to the crash, I did not hear a whistle blow nor did I hear the sound of a bell; prior to the crash I did not hear a horn. Immediately after the crash, I heard a long whistle; that whistle was, I would say, at least a half minute or more."

At the conclusion of the plaintiffs' testimony, a motion for judgment as of nonsuit was allowed, and the actions were dismissed as of nonsuit. From a judgment of nonsuit, the plaintiffs appealed to this Court.

*Pittman, Staton and Betts by William W. Staton and Ronald T. Penny for plaintiff appellants.*

*Harrington, Cameron & Love; Henry & Henry by Ozmer L. Henry for defendant appellee.*

CAMPBELL, J.

As Higgins, J., so appropriately stated in *Faircloth v. R. R.*, 247 N.C. 190, 100 S.E. 2d 328, "[f]or reasons readily apparent, the Court has encountered difficulty in laying down hard and fast rules governing liability in train-automobile grade crossing accidents. '. . . [E]ach case must stand upon its own bottom, and be governed by the controlling facts there appearing.' . . . It is a matter of common knowledge that a train cannot leave the track. . . ."

In *Cox v. Gallamore*, 267 N.C. 537, 148 S.E. 2d 616, the Supreme Court stated that:

". . . [T]he driver of an automobile, who knows, or, by the exercise of a reasonable lookout in the direction of his travel, should know, that he is approaching a railroad crossing, may

not proceed to and upon it without looking in both directions along the track merely because he has heard no signal of an approaching train. The driver, who knows, or should know, that he is approaching a crossing at which his view of the track is obstructed, owes to the passengers in his vehicle the duty to reduce his speed so that he can stop the vehicle, if necessary, in order to avoid a collision with an approaching train. The train has the right of way at the crossing and it is the duty of the driver of the automobile who sees, or should see, the approaching train in time to stop, to do so." (Citations omitted)

[1]    Therefore, where a driver knows about a railroad crossing, he has a duty to approach such crossing with care and at a speed which would permit him to stop the vehicle if necessary to avoid a collision with an oncoming train. However, a different rule applies where there is a blind crossing or where there is an unmarked crossing and the driver has no notice or knowledge of the crossing. As to the latter rule, see *Kinlaw v. R. R.*, 269 N.C. 110, 152 S.E. 2d 329; *Cox v. Gallamore, supra; Henderson v. Powell*, 221 N.C. 239, 19 S.E. 2d 876; and *Harper v. R. R.*, 211 N.C. 398, 190 S.E. 750.

In *Hinnant v. R. R.*, 202 N.C. 489, 163 S.E. 555, the plaintiff was a passenger in an automobile which collided with a train at a blind crossing.

"The complaint [painted] the following picture: The driver of an automobile along a public road intersected by a railroad track, [arrived] at the crest of a hill 300 feet from the track. The hill [was] 22-½ feet higher than the track. His vision to the left [was] obstructed by shrubbery growing upon the right of way. There [was] a crossing sign plainly visible, and telegraph poles along the tracks [gave] warning of the presence of a railroad. The road [was] wet and slippery. Notwithstanding, the driver [did] not slacken his speed or attempt to bring his car under control, but [drove] ahead at the rate of 25 or 30 miles an hour. A heavy freight train . . . [was] approaching the crossing, but [gave] no signal. When the driver . . . [reached] a point 69 feet from the track the freight train 'burst into view at the crossing.' . . . He attempted to stop the car, but he was operating it, under the circumstances, in such a manner that he could not control it, and thereupon he leaped from the car, leaving his passenger to his fate. The car [plunged] ahead and [struck] the train. . . ."

The Supreme Court in that case laid down the following four

rules for determining whether or not the acts of the driver constituted the sole proximate cause of the passenger's injury:

". . . (1) The negligence of the driver must be such as to bar his recovery if he should sue for any injury sustained by him. [In other words, the driver must have been guilty of contributory negligence as a matter of law.] . . .

(2) The negligence of the driver must be palpable and gross. *Herman v. R. R.*, 197 N.C., 718, 150 S.E., 361. In that case, *Stacy, C.J.,* says: '. . . [T]he defendant [railroad] had a right to operate the train over its track, and the negligence of the driver of the automobile is so palpable and gross . . . as to render [the driver's] negligence the sole proximate cause of the injury.

(3) If the act of the driver is a new, independent, efficient and wrongful cause, intervening between the original wrongful act and the injury, then such act of such driver is deemed to be the proximate cause of the injury, upon the theory that the primary or original negligence was thereby insulated. . . .

(4) The new, independent, efficient intervening cause must begin to operate subsequent to the original act of negligence and continue to operate until the instant of injury.

Foreseeability is the test of whether the intervening act is such a new, independent and efficient cause as to insulate the original negligent act. That is to say, if the original wrongdoer could reasonably foresee the intervening act and resultant injury, then the sequence of events is not broken by a new and independent cause, and in such event the original wrongdoer remains liable." (Citations omitted)

Applying the doctrine of insulating negligence, the Supreme Court there held that the law did not impose upon the defendant's engineer the duty of foreseeing the negligent conduct of the driver.

In *Jones v. R. R.*, 235 N.C. 640, 70 S.E. 2d 669, the defendant railroad had permitted corn to be grown on its right-of-way, and this corn obstructed the view of drivers of oncoming automobiles. However, the driver of the automobile involved in the grade crossing collision with the train in that case "had crossed the tracks at [that] point many times, was familiar with the crossing and surrounding conditions, and knew that trains passed frequently." On the afternoon in question, the driver came up to the railroad tracks and stopped. He then started forward and, as he drove onto the tracks, he did not look anymore. He testified that after driving onto the

tracks the next thing he knew, he had been hit by a train. No signal by whistle or horn had been given by the approaching train. The Supreme Court stated:

". . . [I]f it be conceded that the defendant was negligent in allowing the corn to grow upon the edge of its right of way and in failing to give warning signal of the approach of its train to the crossing, nevertheless, it is clear that the active negligence of the driver of the automobile, subsequently operating, was the real, efficient cause of the injury to the [passenger in the automobile]. It is manifest that the negligence of the husband in driving without looking through an area of some 27 to 30 feet in which his vision was unobstructed intervened and insulated the prior negligence of the defendant and became the sole proximate cause of the [passenger's] injury." To like effect, see *Faircloth v. R. R., supra,* and *Godwin v. R. R.,* 220 N.C. 281, 17 S.E. 2d 137.

In *Jeffries v. Powell,* 221 N.C. 415, 20 S.E. 2d 561, an automobile passenger was killed in a grade crossing collision between a train and automobile. The Supreme Court pointed out that there was no evidence to show whether the train was operating at an unlawful or negligent rate of speed. It was then pointed out that even if the train was required to give a signal of its approach and failed to do so, it was nevertheless clear from the evidence that the negligence of the driver of the automobile was such as to insulate any negligence of the railroad and that the driver's negligence was the sole proximate cause of the collision. It was held that the negligence of the driver was patent because he drove the automobile into a known zone of danger without looking. This negligence of the driver, which began to operate subsequent to any negligent act on the part of the railroad and which continued to operate until the time of impact, intervened between the defendant railroad's failure to give a signal of approach and the passenger's injury.

[2]   In the case at bar the driver of the truck was familiar with the railroad crossing. She knew that she could not see down the tracks until reaching the edge of Chatham Street and that she was driving at a speed which would not permit her to stop the truck upon reaching the edge of Chatham Street and before reaching the tracks. If it is conceded that the defendant was negligent in not blowing a horn or sounding a whistle, it is nevertheless clear that the driver's negligence in trying to outrun the train by picking "up speed in an effort to go around the front of the train" could not have been reasonably foreseen by the defendant. This was such an intervening act

of negligence as to be deemed the sole proximate cause of the collision.

Affirmed.

MALLARD, C.J., and MORRIS, J., concur.